**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| SILVERWING AT SANDPOINT, LLC, an Idaho limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>BONNER COUNTY, an Idaho municipal corporation,<br>Defendant. | CASE NO. 2:12-cv-00287-EJL-LMB<br><br>**ORDER AND REPORT AND RECOMMENDATION** |

This action is before the Court on Defendant Bonner County's Motion for

Judgment on the Pleadings and a Request for Judicial Notice. (Dkt. 16).  Defendant seeks

dismissal of counts one, two, and three of the Complaint (Dkt. 1).  The County also seeks

joinder of the Federal Aviation Administration ("FAA") as a necessary party.  The Court

has reviewed the record, applicable law, as well as having considered the written and oral

arguments of counsel for the parties.  With the foregoing in mind, the Court enters the

following recommendation that Bonner County's motion be granted in part and denied in

part consistent with the following report and recommendation.

## REPORT[1]

Plaintiff Silverwing at Sandpoint ("Silverwing") is a residential development in

Sandpoint, Idaho.  Silverwing is a unique fly-in airpark neighborhood consisting of more

---

[1] Unless otherwise noted, all facts are taken from Plaintiff's Complaint, and all factual inferences have been drawn in favor of Plaintiff as the non-moving party.

than 18 acres at the Sandpoint airport in Sandpoint, Idaho ("airport").  The development

features 44 lots, with several available building plans all featuring an airplane hangar on

the ground floor and luxury-style living quarters above.  The units are priced between

$900,000 to more than $2,000,000.  The community is located on the west-side of the

public-use airport, which is sponsored and maintained by defendant Bonner County.  The

airport features a 5,500' x 75' asphalt runway and is located approximately two miles

north of the Sandpoint city center.

The main design feature of the Silverwing community is easy, convenient, and

unfettered access to the airport runway.  This access is designed to allow Silverwing

residents the convenience of being able to go directly from their residence directly to the

airport runway.  This is commonly referred to as "through the fence" access.

Development of the Silverwing community began in April 2006, when it

purchased 18.1 acres of land adjacent to the Sandpoint airport.  The purchase included a

perpetual taxi way easement in favor of Silverwing residents.  The easement was

executed and recorded by Bonner County in May 1994, prior to Silverwing's purchase of

the property.

Design of the development began in early 2007, when Silverwing obtained a copy

of what was purported to be a current copy of the Airport Layout Plan (ALP) on file with

the FAA.  In late January 2007, Silverwing submitted design plans to the County which

included a 45-hangar subdivision, two fixed base operations buildings and a 1,098'

taxiway that paralleled the west side of the existing runway.  Silverwing also requested,

in addition to County review, that the County submit the proposal to the FAA, as

ORDER AND REPORT AND RECOMMENDATION - 2 -

required, for its consideration and approval.  On February 20, 2007, the city of Sandpoint

planning commission met, considered, and approved the proposed development.  Then, in

March 2007, based on the approval of the planning commission, and its own review, the

city of Sandpoint unanimously approved Silverwing's planned unit development.  At the

same time, Silverwing negotiated and eventually entered into a "Through the Fence

Airport Access Agreement" with the County, which granted Silverwing a perpetual right

of access to the airport runway from Silverwing property, in exchange for a $150 annual

fee.  The agreement became effective April 1, 2007.

In April 2007, the FAA commented on the proposed west taxiway, stating that it

"[has] no objection to its construction …"  On May 3, 2007, the FAA responded to the

County regarding Silverwing's proposed development as a whole.  The FAA stated,

however, that it had "no objection to the proposed development, *provided that the*

*[Through-The-Fence] Agreement between the airport and Silverwing at Sandpoint LLC*

*is approved by our office*." (*Complaint*, Dkt. 1, at 4) (emphasis added).

Given the approval of the County and the apparent approval of the FAA,

Silverwing constructed the taxiway in September 2007, and conducted significant

development at the site, including the grading of all 45 lots, installation of utilities,

paving of streets, installation of a security gate and fencing the perimeter, at a cost in

excess of $6,000,000. In late 2008, Silverwing began heavily marketing the residential

development through print and online media, and at trade shows.

Then, in December 2008, the FAA placed the Sandpoint airport on "non-

compliance" status for a period of three years or until compliance with FAA regulations

ORDER AND REPORT AND RECOMMENDATION - 3 -

is attained.  The FAA's Airport Compliance Program is intended to ensure that airport sponsors, such as Bonner County, comply with Federal obligations assumed when accepting Federal grant funds or a transfer of Federal property for airport purposes.  In this instance, the FAA concluded that the new Silverwing taxiway was problematic because it included a number of mid-field runway access points.  Also at issue was Bonner County's through-the-fence agreement with Silverwing, because the project included a residential development, which is strongly discouraged by the FAA.  (*See Motion for Judgment on the Pleadings*, Dkt. 16-1 at 9-11).

As a result of being placed on non-compliance status, the County lost its eligibility to receive federal funding and assistance under the Airport Reinvestment Program. In response, in January 2009, the County hired an expert, Chris Popov, to address compliance issues and implemented a Corrective Action Plan (CAP).  At the FAA's direction, the plan sought to "(1) pursue[] all avenues to extinguish the perpetual nature of the Silverwing TTF easement; and (2) pursue[] an amendment to the Silverwing … TTF agreement to require access only to the end of the runway; midfield access is unacceptable from a safety perspective." (*Id.*).  The FAA partially accepted the CAP in February 2009, though issues remained regarding the residential perpetual easement.

Further complicating matters, in March 2009, the FAA notified the County of its concerns with the location of the newly constructed Silverwing taxiway.  The FAA stated that, in addition to issues with midfield access, the taxiway "was built based upon [the County's] proposed plan to keep the runway at its existing location." (*Complaint*, Dkt. 1 at 8-9).  However, implicit in the FAA statement was the notion that the airport would not

keep the runway at its existing location, but would instead expand to meet the FAA's B-II

design standard, which would involve "shifting the runway 60-feet to the west to provide

the standard 240-feet runway taxiway separation."   (*Id*. at 10-11).  This proposed runway

shift would cause trouble for Silverwing, as relocation of the newly constructed taxiway

would come at significant expense.  (*Id*.)

Silverwing claims that despite the FAA recommendation regarding a B-II design

upgrade, the County represented, through Popov, that "the Airport was never going to

actually change the Airport's runway because it was not practical and/or feasible."  (*Id*. at

8).  Silverwing claims that Popov further represented that "he would take care of this

issue with the FAA so that Silverwing would not have to move [the] taxiway."  (*Id*.)

While the County, Silverwing and the FAA were grappling with the airport's non-

compliant status, development continued.  Likewise, in March 2009, the City of

Sandpoint approved the Building permit for construction of a duplex, with work

commencing on the project the next month. The unit was completed in December 2009

and a temporary certificate of occupancy was issued by the city.  According to

Silverwing, by this time, their total investment in the development exceeded $15,000,000.

While development was ongoing, Silverwing claims that it worked with the

County and the FAA to bring the airport back into compliant status.  In that vein, in 2009,

Silverwing retained the services of an aviation attorney, who it claims worked to resolve

the issues the development posed to the airport. Additionally, Silverwing claims that it

agreed to eliminate the taxiway mid-field access points, provided the County pave two

small sections at the ends of the taxiway.  Eventually, the FAA agreed to allow

Silverwing residents TTF access, and it adopted official policy allowing such in March 2011.  (*Complaint*, Dkt. 1-2 at 10).

According to Silverwing, once the policy was adopted, the County reversed course on plans to upgrade the ALP to a B-II design, demanding that Silverwing relocate the taxiway at its own expense.  According to Silverwing this is contrary to numerous representations made by Popov from March 2009 to March 2011. In response to the County's demand, Silverwing proposed that the County abandon the B-II upgrade because of the disruption and expense involved, as well as Popov's representations of having no such plans.  The County rejected Silverwing's request, and continued to pursue amending the ALP to B-II standards, which would necessitate relocation of the Silverwing taxiway to the west and also encroach into the planned Silverwing development.  With that in mind, in December 2011, the County submitted an Amended Corrective Action Plan to the FAA including an updated ALP that depicts the relocation of the runway to the west.

> The County's proposal explained that:
>
> [T]he real property necessary to give the County a significant real property holding on the west side for both airport expansion of services and the proposed runway relocation and the west taxiway is depicted to show that property which the airport will acquire.  Included in this acquisition plan is the Silverwing parcel which will be acquired in whole or in part, but to include an acquisition of the portion adjoining the runway environment …including the residential access rights.

(*Complaint*, Dkt. 1 at 12).  The Amended ALP depicted the County acquiring the entire Silverwing development.  It was approved by the County on October 11, 2011, and by the FAA on October 24, 2011.

ORDER AND REPORT AND RECOMMENDATION - 6 -

In February 2012, the FAA placed the airport tentatively back into compliance conditioned on the airport continuing to pursue extinguishing Silverwing's perpetual easement rights, and modification of the existing TTF agreement.

According to Silverwing, up until March 2011, when the FAA policy allowing Silverwing TTF access went into effect, the County had no intentions of upgrading to a B-II facility.  However, after the policy went into effect, the County "has publically stated its intention of acquiring all or some of the Silverwing development and has been aggressively working to extinguish Silverwing's easement and TTF rights through various administrative actions.  According to Silverwing, the County has been unwilling to purchase the property and associated rights. (*Complaint*, Dkt. 1-2 at 13).

Because of the County's actions, Silverwing now asserts that it must disclose, to any potential buyer, the County's efforts to eliminate Silverwing's TTF access. Silverwing thus claims that this has significantly hampered its ability to market and sell properties in the community, and caused it substantial damages.  (*Id*.)

In this action, Silverwing makes three claims against the County: 1) breach of an implied covenant of good faith and fair dealing with regard to the Silverwing TTF agreement; 2) inverse condemnation; and 3) violation of equal protection.

The County requests an Order joining the FAA as a necessary party, dismissing Silverwing's Complaint, and that the Court take judicial notice of seven exhibits. Exhibits 1-3 are attached to the County's moving papers (Dkt. 16-2), and Exhibits 4-7 accompany the County's supplemental request for judicial notice.  (Dkt. 26-2).

ORDER AND REPORT AND RECOMMENDATION - 7 -

## A.  Judicial Notice

The County requests that the Court take judicial notice of seven documents consisting of: 1) The Sandpoint Airport ALP (Approved by the FAA 11/12/03); 2) The TTF agreement between; 3) a July 2012 FAA DRAFT Compliance Guidance Letter regarding Residential Through-the-Fence Access Agreements (Dkt. 16-2); 4) A portion of the FAA Airport Compliance Manual, dated September 30, 2009; 5) Chapter 12 of the Sandpoint City Code; 6) The Sandpoint Airport Master Plan; and 7) A November 2002 Final Report on the Sandpoint Airport Master Plan.  (Dkt. 26-2).

While Silverwing does not object to the Court taking notice of the TTF agreement, the FAA Compliance Guide Letter, the FAA manual, or the Sandpoint City Code, it opposes notice of the 2003 ALP, as well as the Airport Master Plan, and the Master Plan Report, because both contain the 2003 ALP. As a general proposition, Silverwing resists the requests because it claims that in 2007, when Silverwing requested a current ALP from the County, the County supplied Silverwing with *a different ALP*, which did not depict upgrading the airport to B-II design standards. Rather, Silverwing contends that for a number of years the County expressly denied any intentions of upgrading.

Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The Court may take judicial notice of undisputed matters of public record, *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001), including documents on file in federal or state courts.

ORDER AND REPORT AND RECOMMENDATION - 8 -

*See Bennett v. Medtronic, Inc.,* 285 F.3d 801, 803 n. 2 (9th Cir. 2002). Although a Court may take judicial notice of the foundational documents and their facts, the Court is not permitted to take notice concerning "one party's opinion" as to how the recognized documents and their facts should be interpreted. *San Luis Unit Food Producers v. United States,* 772 F.Supp.2d 1210, 1216 n. 1 (E.D.Cal.2011). Furthermore, "[i]f there are two alternative explanations [of a particular set of pled facts], one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca,* 652 F.3d 1202, 1216 (9th Cir.2011) (finding that where "the factual allegations in [Plaintiff's] complaint plausibly suggest[s]" the wrongful conduct asserted, the Complaint should not be dismissed).

There is no dispute that the Court has authority to consider certain evidence outside the pleadings. *See McCall v. Dillard's, Inc.,* 2011 WL 723036 at *2 (W.D. Mo. 2011). Nonetheless, the Court declines to do so at this time. Silverwing takes issue with the accuracy the 2003 ALP supplied by the County, and reasonably claims that it includes matters subject to challenge and review during the discovery phase of the case. Likewise, in this Courts well-formed view, it would be premature to take judicial notice at this early stage in the litigation. Fed. R. Evid. 201(b, d). Accordingly, the County's requests that the Court take judicial notice are denied at this time.

## B. Joinder of the FAA

The County argues that the FAA's preemptive authority over airport design and operation make it a necessary party to this action. Silverwing contends that the role of the FAA is a question for the trier of fact to resolve.

ORDER AND REPORT AND RECOMMENDATION - 9 -

Federal Rule of Civil Procedure 19(a) governs joinder of non-parties. The Ninth Circuit Court of Appeals has interpreted the rule to provide for a two-part analysis. *Yellowstone County v. Pease,* 96 F.3d 1169, 1172 (9th Cir.1996). First, the court must consider if complete relief is possible among those parties already in the action. Second, the court must consider whether the absent party has a legally protected interest in the outcome of the action. *Confederated Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1498 (9th Cir.1991). "If a non-party satisfies either of the two prongs, the non-party is necessary." *Yellowstone County*, 96 F.3d at 1172.

After a thorough review of the pleadings, the Court finds, and thus concludes, that neither prong indicating joinder has been satisfied. Complete relief is possible without joining the FAA, as compensation from the County to Silverwing does not require involvement nor approval of the FAA. Additionally, Silverwing's request that the County abstain from upgrading to a B-II facility does not depend upon FAA approval. Furthermore, the County has not established its contention that it is merely an agent of the FAA. Accordingly, with all the foregoing in mind, the County's motion to join the FAA as a necessary party should be denied.

## C.  Judgment on the Pleadings

Where a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is used to raise the defense of failure to state a claim, such as the case here, it is "functionally identical" to a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1192 (9th Cir.1989). Therefore, the same legal standard applies to both motions. *Id*. Dismissal of a

complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

When evaluating a 12(b)(6) motion, the Court must accept as true all allegations of material facts that are in the complaint, and must construe all inferences in the light most favorable to the non-moving party. *Moyo v. Gomez,* 32 F.3d 1382, 1384 (9th Cir.1994). Judgment on the pleadings is therefore appropriate only "when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.,* 132 F.3d 526, 529 (9th Cir.1997) (internal quotation marks and citation omitted).

### 1.  Breach of Implied Covenant of Good Faith and Fair Dealing

The County argues that Silverwing's claim of breach must be dismissed because it cannot enter into any agreement regarding airport facilities without FAA approval.  In fact, the County argues that Silverwing is attempting to compel the County to continue to permit mid-field access in violation of FAA safety regulations.  The County reasons that any such commitment would be entirely preempted by the FAA.

Silverwing argues that it is the prerogative of the County, and not the FAA, to elect to upgrade the airport to a B-II facility.  Silverwing alleges that it is not attempting to circumvent FAA regulations, but is working with the FAA to bring the airport into compliance.  Silverwing strongly argues that there is simply no basis for the County to argue that the FAA is requiring the B-II design upgrade.  Rather, Silverwing alleges that

ORDER AND REPORT AND RECOMMENDATION - 11 -

it is the County's decision alone, and that this litigation could have been avoided if the County had originally notified Silverwing of its intentions to upgrade to a B-II facility.

The covenant of good faith and fair dealing requires that the parties perform the obligations imposed by their agreement in good faith. *Bakker v. Thunder Spring-Wareham, LLC,* 141 Idaho 185, 108 P.3d 332, 339 (2005). Any action that violates, nullifies or significantly impairs any benefit of the contract is a violation of the covenant. *Id.* The covenant cannot override an express provision in the contract and will not be implied if contrary to the terms of the contract. *Independence Lead Mines Co. v. Hecla Mining Co.,* 143 Idaho 22, 137 P.3d 409, 413 (2006). The covenant is an "objective determination of whether the parties have acted in good faith in terms of enforcing the contractual provisions." *Id.*

There is little doubt that the FAA has strong influence over airport planning.  It is beyond reasonable dispute, however, that it is the airport sponsor that is in charge of the level or design standards, with the FAA serving in a review and approve role.

It is a question of fact whether or not the County's attempts of terminating Silverwing's TTF access breached the covenant of good faith and fair dealing. Whether the upgrade to B-II facilities and the County's various attempts to end Silverwing's access to the runway impaired a benefit of the bargain thereby violating the covenant of good faith and fair dealing is a question of fact.  Accordingly, the County's motion for judgment on this claim should be denied.

## 2. Takings Claim and Inverse Condemnation

Count 2 of Silverwing's Complaint seeks just compensation for the taking of property for public use in violation of the Fifth and Fourteenth Amendments to the United States Constitution.  Silverwing contends that County's efforts to eliminate Silverwing's TTF access and upgrade the airport to a B-II facility have made selling the development to prospective buyers impossible, thus constituting a taking of the property. The County asserts, on the other hand, that Silverwing's takings claim is not yet ripe because the County has only made plans to that could impact Silverwing, but no physical or regulatory taking has occurred.

The Fifth Amendment provides "nor shall private property be taken for public use, without just compensation." There are two types of "per se" takings: (1) permanent physical invasion of the property, *see, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426 (1982); and (2) a deprivation of all economically beneficial use of the property, *see, e.g., Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1015–16 (1992). Here, there is no contention that the County's actions constitute a "per se" taking. Silverwing argues instead that the County's actions constitute a regulatory taking because the ordinances go "too far." (Response, Dkt. 22 at 14).

Regulations that go "too far" constitute a taking.  *Penn Cent. v. New York City*, 438 U.S. 104 (1978).  Determining whether a regulation goes too far requires a court to engage in "essentially ad hoc, factual inquiries." *Id.*  at 124.  "[R]egulatory takings challenges are governed by the standards set forth in [*Penn Central* ]." *Lingle v. Chevron,* 544 U.S. 528, 538 (2005). "Primary among [the relevant] factors are [1] the economic

impact of the regulation on the claimant and, particularly, [2] the extent to which the regulation has interfered with distinct investment backed expectations. In addition, [3] the character of the governmental action ... may be relevant in discerning whether a taking has occurred." *Id.* at 538–39. "[T]hese three inquiries ... share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id.*

Silverwing argues it has suffered significant adverse economic impact resulting from the County's efforts to eliminate the TTF access. Silverwing contends that because TTF access is "a critical component" of the development, the County's interference with those rights have made it impossible to market the entire development. Thus, Silverwing claims that the County's actions have caused an economic loss of up to nearly all of the property value. While there is no minimum threshold, Silverwing's Complaint satisfies, with factual sufficiency, the first *Penn Central* factor. *See, e.g., Cienega Gardens v. United States,* 331 F.3d 1319, 1343 (Fed.Cir.2003) (holding that a taking occurred when a regulation effected a 96% loss of return on equity), *Penn Cent.,* 438 U.S. at 125, 98 S.Ct. 2646 ("[T]his Court has upheld land use regulations that destroyed or adversely affected recognized real property interests.").

With regard to the second factor, when Silverwing purchased the property, it claims clearly that it had the expectation that, with the associated runway access easement, once developed, the land could be converted to a more profitable use, specifically the fly-in residential community. The zoning laws, associated property

rights, and associated governmental agencies allowed such development.  In fact, it appears that the County originally supported the development and voluntarily entered into the TTF agreement.  However, the County's efforts now may permanently foreclose that option.

In the instant action, it has been alleged that the County's efforts "…. interfere with what must be regarded as [Silverwing's] primary expectation concerning the use of the parcel." *Id.* at 136. In other words, the County's action could be said to affect all of Silverwing's primary expectations of the use of the property in question.  Moreover, Silverwing's expectation of developing the property is far beyond speculative, as it has spent millions of dollars preparing and marketing the development. According to Silverwing's allegations, the County's actions have made sale of the development to investors impossible. Thus, the second *Penn Central* factor supports maintaining a takings claim at this stage of the litigation.

The final *Penn Central* factor—the character of the governmental action—seeks to answer whether the government action amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good.  —may be relevant in discerning whether a taking has occurred." *Lingle,* 544 U.S. at 539. The government generally cannot "'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Id.* at 537 (quoting *Armstrong v. United States,* 364 U.S. 40, 49 (1960)).

Here, when viewing the Silverwing's Complaint in a light most favorable to the non-moving party, the final *Penn Central* factor also favors maintenance of the takings claim. According to the Complaint, the intent and effect of the County's actions require only that Silverwing provide the public benefit of more space for an upgraded runway at the airport.  While the Court recognizes that it may be impossible to distribute the cost more widely, for example, by expanding to the east and west, or some other configuration, which is a question to be answered by the trier of fact.

Thus, all three *Penn Central* factors weigh in favor of allowing the takings claim to proceed.  Accordingly, Silverwing has adequately pleaded a takings claim under the Fifth and Fourteenth Amendments.  Accordingly, the County's motion to dismiss this part of Silverwing's Complaint should be denied.

### 3.  Equal Protection

Silverwing's final claim is that the County violated its equal protection rights in seeking to extinguish Silverwing's easement and TTF access, while ignoring the easement and TTF access of other similarly situated landowners on the west side of the airport runway.  The County argues that this claim must fail because Silverwing has failed to allege that the other west side landowners are residential TTF projects, as is Silverwing.  The County argues that this distinction is critical because residential TTF properties are subject to a separate and distinct set of regulations from those applicable to commercial TTF properties, thus providing a rational basis for the difference in treatment.

The Equal Protection Clause of the Fourteenth Amendment "commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 570 (9th Cir.1990) Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike" by governmental entities. *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas,* 310 U.S. 141, 147 (1940).

Silverwing concedes that the other west-side property owners are in fact different types of enterprises.  However, Silverwing maintains that it has stated a valid "class of one" claim because when the FAA notified the County that all west-side easements render the airport non-complaint, the County ignored the other easements, and only sought to extinguish Silverwing's access rights.

Successful Equal Protection claims have been recognized when brought by a "class of one" where the plaintiff has alleged that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (Section 1983 action). Notably, the Ninth Circuit Court of Appeals has indicated that such actions are disfavored because they threaten to "provide a federal cause of action for review of almost every executive or administrative

government decision." *Engquist v. Or. Dept. of Agric.,* 478 F.3d 985, 993 (9th Cir.2007)

(discussing a case alleging employment discrimination by the government).

Silverwing has not alleged sufficient facts to proceed on a rational basis theory.

Under a rational basis inquiry, in order to state an equal protection claim, Silverwing

must allege facts that it is similarly situated to others and is being treated in a disparate

manner, and that there is no rational basis for the disparate treatment. *See More v.

Farrier,* 984 F.2d 269, 271 (8th Cir.1993). Here, a legitimate reason existed for the

difference in treatment between a residential community and commercial enterprises. In

the Court's view, Silverwing's Complaint does not allege sufficient facts to establish that

it is similarly situated to others or, that, if it were treated differently that there is no

rational basis for such treatment. Accordingly, it is recommended that Silverwing's equal

protection claim be dismissed.

## ORDER

In accordance with the foregoing, it is hereby ORDERED that Defendants Request

for Judicial Notice (Dkt. 16-2) and Supplemental Request for Judicial Notice (Dkt. 26-2)

are DENIED.

## RECOMMENDATION

It is hereby RECOMMENDED that Defendant's Motion for Judgment on the

Pleadings (Dkt. 16) be GRANTED in part, and DENIED in part consistent with the

following:

1. DENIED as to the request to join the Federal Aviation Administration as a

    necessary party;

2.  DENIED as to Judgment on the Pleadings regarding Count One for Breach;

3.  DENIED as to Judgment on the Pleadings regarding Count Two for Taking

    without Compensation; and

4.  GRANTED as to Judgment on the Pleadings regarding Count Three for

    violations of Equal Protection.

DATED: August 14, 2013



Honorable Larry M. Boyle
United States Magistrate Judge

Written objections to this Report and Recommendation must be filed within

fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1 or as a result

that party may waive the right to raise factual and/or legal objections in the Ninth Circuit

Court of Appeals.  The parties are advised that this is a report and recommendation and

not a final, appealable order, and thus no appeal can be taken from this report and

recommendation.