UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SILVERWING AT SANDPOINT, LLC., an Idaho limited liability company, | Case No. 2:12-CV-00287-EJL-LMB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| BONNER COUNTY, an Idaho municipal corporation, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court in the above-entitled matter is Defendant Bonner County's Motion for Summary Judgment or Partial Summary Judgment and Motion to Bifurcate. The parties have filed their responsive briefing and the matters are ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument.

## FACTUAL AND PROCEDURAL BACKGROUND

The subject matter of the dispute in this case concerns certain real property abutting the Sandpoint Airport (the "Airport") in Sandpoint, Idaho. (Dkt. 77.)[1] In April of 2006, Plaintiff SilverWing at Sandpoint, LLC ("SilverWing") purchased 18.1 acres of land on the west side of the Airport upon which it intended to design and construct a 45-unit Planned Unit Development ("PUD") of hangars for airplanes with optional second-floor residences. SilverWing claims that included with the purchase of land was a perpetual Taxi Way Easement allowing it, and the residents of the proposed development, to access the Airport's runway from its property. (Dkt. 77 at ¶ 6.)

In 2007, SilverWing requested the current Airport Layout Plan ("ALP") on file with the Federal Aviation Administration ("FAA"). Copies of an ALP were provided to SilverWing by the Airport Manager, Jorge O'Leary, as well as Mark Napier.[2] SilverWing relied upon that APL in making the plans it submitted for the proposed PUD to the Defendant Bonner County (the "County").[2] Those plans called for construction of a 1,098 foot taxiway that paralleled the Airport to the west (the "West Taxiway"). This West Taxiway was plotted to be located so as to ensure there would be the FAA required 240 feet between the centerlines for the taxiway and the existing Airport runway based upon

---

[1] The Airport is a publicly owned general aviation airport. (Dkt. 80-2 at ¶ 2.)

[2] Defendant Bonner County contracted with W&H Pacific, Inc. on the Airport project and Mr. Napier was the project manager.

[2] The County is an Idaho municipal corporation that is the designated sponsor and operator of the Airport. (Dkt. 80-2 at ¶ 1.)

the ALP provided to SilverWing. The County forwarded SilverWing's proposal on to the FAA. On February 20, 2007, the Sandpoint Planning Commission approved SilverWing's PUD. The following month the City of Sandpoint also approved the PUD. In April of 2007, the FAA stated it had "no objection" to the construction of the proposed West Taxiway provided that the taxiway design standards meet FAA design requirements. (Dkt. 85-7 at 53.)

On April 1, 2007, SilverWing and the County entered into a through-the-fence agreement ("TTF") granting SilverWing a perpetual right of access to the Airport in private aircraft from the PUD property for a yearly access fee. (Dkt. 80-4, Ex. B at 7.)[3] The TTF was recommended to the County by a majority vote of the Sandpoint Airport Advisory Board. (Dkt. 77 at ¶ 23.) On May 3, 2007, the FAA indicated to the County that it had no objection to SilverWing's proposed development so long as the TTF was approved by the FAA. (Dkt. 85-7 at 54.)

SilverWing alleges that the County was aware that it had to receive FAA approval of the TTF but failed to do so and further failed to inform SilverWing that it had not obtained the FAA approval. (Dkt. 77 at ¶¶ 13, 14.) Furthermore, SilverWing claims it did not know the approval had not been received from the FAA and by September of 2007 it had conducted significant work on the PUD development spending over $6,100,000.

_____

[3]As used in this case, TTF is an agreement between SilverWing and the County providing for an easement which would allow SilverWing, and the residents of its PUD, access to the Airport from its property.

**MEMORANDUM DECISION AND ORDER - 3**

(Dkt. 77 at 15.) SilverWing also claims it constructed the West Taxiway at a cost of more than $500,000. (Dkt. 77 at ¶ 19.) In late 2008, SilverWing states that it began investing significant money into marketing the PUD development worldwide through print ads, on-line media, and trade shows. (Dkt. 77 at ¶ 25.)

In December of 2008, the FAA placed the Airport in "non-compliance" status for three years or until the Airport achieved compliance with respect to: 1) the County entering into the TTF with SilverWing without FAA approval and 2) the existence of mid-field runway access points throughout the Airport. (Dkt. 77 at 7) (Dkt. 80-2 at ¶ 19.) To bring the Airport back into compliance, in January of 2009, the County implemented a Corrective Action Plan ("CAP").

On March 25, 2009, the FAA expressed concerns regarding the proposed changes intended to bring the Airport up to B-II design. (Dkt. 85-8 at 27.) In particular as to the proposal to move the Airport runway 60 feet to the west, towards the newly constructed West Taxiway, which would result in there no longer being the required 240 foot runway-taxiway separation between the runway and West Taxiway. SilverWing alleges it became aware of the FAA's concerns but that it justifiably relied upon the County's representations that it would not have to relocate the West taxiway. (Dkt. 77 at ¶¶ 33-34.) From March to December of 2009, SilverWing began construction on the PUD and was giving tours of model duplex and spec units. During this same time, representatives from SilverWing and the County met with the FAA to try to resolve the Airport's compliance issues.

In 2011, SilverWing alleges the County, contrary to its prior representations, notified SilverWing that it would be required to remove the West taxiway and relocate it 60 feet to the west in order for the County to upgrade the Airport to a B-II design. SilverWing objected arguing it placed the West Taxiway in compliance with the ALP.

In December 2011, the County submitted an Amended Corrective Action Plan ("Amended CAP") to the FAA depicting the relocation of the Airport's runway and SilverWing's taxiway to the west. (Dkt. 85-8 at 32.) The Amended CAP further states that the County will "acquire" SilverWing's real property. The FAA and the County approved the Amended CAP in October of 2011. In February 2012, the FAA tentatively placed the Airport back into compliance based on the Amended CAP which included extinguishing SilverWing's perpetual easement rights and modifying its TTF.

As a result, SilverWing filed this action against the County alleging claims for:

| | |
|---|---|
| Count 1: | Breach of the Covenant of Good Faith and Fair Dealing |
| Count 2: | Taking Without Compensation - Inverse Condemnation (42 U.S.C. § 1983) |
| Count 3: | Violation of Equal Protection (42 U.S.C. § 1983) |
| Count 4: | Promissory Estoppel |

(Dkt. 77.) The County has filed this Motion for Summary Judgment arguing SilverWing's claims should be dismissed as a matter of law and a Motion to Bifurcate. (Dkt. 80, 81.) The Court finds as follows.

# STANDARD OF REVIEW

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no 'genuine issue of material fact,' since a completely failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.[4]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine,"

---

[4] *See also,* Rule 56(3) which provides, in part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. *See, e.g., British Motor Car Distrib. V. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371 (9th Cir. 1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

Of course, when applying the above standard, the court must view all of the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Hughes v. United States*, 953 F.2d 531, 541 (9th Cir. 1992).

## ANALYSIS

### 1. Law of the Case

Prior to the filing of the instant Motions, the Court issued a ruling on the County's Rule 12(c) Motion for a Judgment on the Pleadings denying the same. (Dkt. 16, 53, 71.)

In doing so, the Court applied the standard applicable to a Rule 12(c) Motion and determined that SilverWing had stated plausible claims for relief when viewing the allegations in the light most favorable to the Plaintiff. (Dkt. 71.) In so finding, the Court explicitly noted that whether the claims survived later dispositive motions had not been decided.

On this Motion for Summary Judgment, SilverWing argues the "law of the case" doctrine applies and the Court should deny this Motion because it has already decided some of the arguments raised by the County. (Dkt. 85 at 4-5.) The County opposes this argument noting the doctrine does not apply as SilverWing has argued. (Dkt. 86 at 10 n. 8.) The Court agrees with the County.

"Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'" *United States v. Alexander*, 106 F.3d 874, 876-77 (9th Cir. 1997) (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)). "A court may have discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result. Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion." *Id.* (citation omitted). This rule applies to cases in which a submission to the jury separates the two decisions. *See*

*Robins v. Spokeo, Inc.*, 742 F.3d 409, 411 (9th Cir. 2014) (citing *United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (per curiam)).

The Ninth Circuit has held, however, that "the law-of-the-case doctrine does not apply 'to circumstances where a district court seeks to reconsider an order over which it has not been divested of jurisdiction.'" *Id.* (quoting *Smith supra*). This Court has not been divested of jurisdiction nor submitted this case to the jury. Therefore, it is free to reconsider its own prior rulings uninhibited by the law of the case doctrine. Furthermore, this Court is not "reconsidering" its prior ruling on the Rule 12(c) Motion that concluded SilverWing had stated plausible claims. In this Order, the Court applies the standard found in Rule 56 as is applicable to this Motion for Summary Judgment.

## 2. Judicial Notice

Attached to its Motion for Summary Judgement is the County's Request for Judicial Notice. (Dkt. 80-6.) The County asks that the Court take judicial notice of certain listed documents filed in support of the County's Motion for Judgment on the Pleadings. (Dkt. 80-7 through 80-21.) The County later filed a supplemental request for Judicial notice to include an additional document, United States Department of Transportation FAA Advisory Circular 150/5300-13A issued on September 28, 2012. (Dkt. 86-6.) SilverWing opposes judicial notice of only the 2003 Airport Layout Plan (2003 ALP). (Dkt. 85-2) (Dkt. 94.) SilverWing argues any inferences regarding the FAA's regulatory position in regards to the 2003 ALP are the subject of a genuine and vigorous dispute and, therefore, the Court should not take judicial notice of the same.

In deciding a motion for summary judgment, the court may consider evidence that can be judicially noticed under Rule 201 of the Federal Rules of Evidence. Under that rule, courts may judicially notice a fact that is not subject to reasonable dispute because it either: (1) is generally known within the trial court's territorial jurisdiction or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The Court may take judicial notice of matters of public record and government documents available from reliable sources. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (on a motion to dismiss, court may consider matters of public record).

Here, SilverWing disputes both the existence and legal effect of the 2003 ALP. SilverWing argues that in 2006 it requested a copy of the Airport's current ALP on file with the FAA from the County. On August 18, 2006, SilverWing asserts it received a copy of the Airport ALP from the Airport Manager, Jorge O'Leary, which showed the existing location of the runway and made no mention of plans to move the runway as was consistent with the layout known as Alternative 2(B) in the 2002 Airport Master Plan. (Dkt. 85-2 at 3-4.) SilverWing maintains that it discussed this layout with other County officials and relied upon the same when, in January 2007, it submitted its development plans to the County on FAA Form 7460 for review. Those development plans were specifically based on the ALP depicting Alternative 2(B). The County provided comments to the plans and then submitted the final Form 7460 to the FAA. In May 2007, the FAA advised the County that it had no objection to SilverWing's proposed

development in Form 7460 so long as the FAA approved the TTF Access Agreement.

Similarly, SilverWing argues in January 2007 it submitted FAA Form 7480 to the County for its review that detailed plans for the construction of a new taxiway at the Airport based on the ALP it had received showing Alternative 2(B)'s layout. Again, the County provided comments and then submitted the final Form 7480 to the FAA for its approval. In April 2007, the FAA notified the County that the Form 7480 was not contrary to the safe and efficient use of navigable airspace. SilverWing then built the proposed taxiway.

For these reasons, SilverWing argues that disputed facts as to the 2003 ALP preclude taking judicial notice of that document. In particular, SilverWing argues it challenges how the 2003 ALP was submitted to the FAA and why the County did not disclose the 2003 ALP to SilverWing. Alternatively, SilverWing argues the Court should only take judicial notice of the existence of the 2003 ALP but not draw any inferences or judicially notice any facts in dispute regarding that document. The County responds arguing the 2003 ALP was available to the public and, as such, it can be accurately and readily determined and judicial notice is proper. (Dkt. 86-9.)

The Court has reviewed the 2003 ALP and finds that judicial notice pursuant to Rule 201 as to the existence of that document is appropriate. (Dkt. 80-7, Ex. 1.) The Court will limit its recognition of the document to only its existence. For the reasons stated by SilverWing in its opposition to the request for judicial notice, the Court will not draw any inferences or resolve any disputed facts from the same. Because there is no

opposition to the remaining documents, the Court grants the request for judicial notice as to those materials.

**3.      Federal Preemption**

The County argues that the state law claims should be dismissed as a matter of law because aviation safety and airport design standards are entirely preempted by federal law. (Dkt. 80 at 7.) The County maintains its actions were taken in compliance with mandated statutes and FAA promulgated regulations concerning airport safety. (Dkt. 80 at 11.) SilverWing counters that federal preemption does not extend to local decisions about siting or expanding airports; essentially arguing that the County controlled the decision to expand the Airport, not the FAA. (Dkt. 85 at 6-7.)

**A.      Preemption**

"It is well-established that Congress has the power to preempt state law." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007) (citing U.S. CONST. ART. VI, cl. 2; *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)). The Supremacy Clause of the United States Constitution, Article VI, Clause 2, declares that "the laws of the United States ... shall be the supreme law of the land," thereby "invalidat[ing] state laws that interfere with, or are contrary to, federal law." *Goodspeed Airport, LLC v. East Haddam Inland Wetlands and Watercourses Com'n*, 681 F.Supp.2d 182, 199 (D. Conn. 2010) (quoting *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008)). When considering a claim of federal preemption, a court's principal focus is discerning whether Congress intended to displace an area of state law. *Id.* (citing *Crosby*

*v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983)).

"Whether federal law preempts a particular state action is fundamentally a question of congressional intent." *Johnson v. Rancho Santiago Comm. Coll. Dist.*, 623 F.3d 1011, 1022 (9th Cir. 2010) (citation omitted). "[C]ongressional intent 'is the ultimate touchstone of preemption analysis,' when 'Congress adopts a statute that provides a reliable indication of Congressional intent regarding preemption, the scope of federal preemption is determined by the statute.'" *Omnipoint Communications, Inc. v. City of Huntington Beach*, 738 F.3d 192, 193 (9th Cir. 2013) (quoting *Engine Mfrs. Ass'n v. South Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040)); *see also Martin v. Midwest Express Holdings, Inc.*, 555 F.3d 806, 808 (9th Cir. 2009) ("The touchstone of preemption is congressional intent."). "Federal law will preempt state laws that 'interfere[s] with, or are contrary to, federal law' only if 'that was the clear and manifest purpose of Congress.'" *Johnson*, 623 F.3d at 1023 (quoting *Engine Mfrs.*, 498 F.3d at 1039-40).

Preemption may be either express or implied. *Montalvo*, 508 F.3d at 470. "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Id.* (quoting *Cipollone*, 505 U.S. at 516) (citation omitted). "Nothing in the [Federal Aviation Act] expressly preempts state regulation of air safety, so preemption, if any, must be implied." *Id.*; *see also Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc.*, 555 F.3d 806, 808 (9th Cir. 2009) (The Federal Aviation

Act has no express preemption clause.). Therefore, the issue here is whether implied preemption applies to this case.

There are two types of implied preemption: conflict preemption and field preemption. Conflict preemption exists when a state law actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Field preemption occurs when Congress indicates in some manner an intent to occupy a given field to the exclusion of state law or, when federal law so thoroughly occupies a legislative field "as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone*, 505 U.S. at 516 (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)). In this case, the Court finds that Congress has indicated its intent to occupy the field of aviation safety. *See Montalvo*, 508 F.3d at 470-71.

Courts have "generally analyzed [Federal Aviation Act] preemption by looking to the pervasiveness of federal regulations in the specific area covered by the tort claim or state law at issue." *See Estate of Sesay v. Hawker Beechcraft Corp.*, No. 2:11-cv-04637, 2011 WL 7501887, at *3 (C.D. Cal. Dec. 9, 2011) (quoting *Martin*, 555 F.3d at 809); *see also Ventress v. Japan Airlines*, 828 F.Supp.2d 1166, 1173 (D. Hawai'i 2011) (discussing *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 633 (1973)). The Federal Aviation Act declares that "The United States Government has exclusive sovereignty of

airspace of the United States," 49 U.S.C. § 40103(a)(1), and directs the FAA

Administrator to "develop plans and policy for the use of the navigable airspace and

assign by regulation or order the use of the airspace necessary to ensure the safety of

aircraft and the efficient use of airspace." 49 U.S.C. § 40103(b)(1); *see also* 49 U.S.C. §

40103(b)(2). Navigable airspace is defined broadly as "airspace above the minimum

altitudes of flight prescribed by regulations ..., including airspace needed to ensure safety

in the takeoff and landing of aircraft." 49 U.S.C. 40102(32).

The primary purpose of the Federal Aviation Act is safety through the "creat[ion]

and enforce[ment of] one unified system of flight rules." *Montalvo*, 508 F.3d at 471

(citation omitted); *see also Air Transport Ass'n*, 520 F.3d at 224 (quoting *Burbank*, 411

U.S. at 639) ("The [Federal Aviation Act] was enacted 'to create a uniform and exclusive

system of federal regulation in the field of airline safety.'"). Congress intended its control

of airspace management to be "concentrated at the national level." *Air Transport Ass'n*,

520 F.3d at 224 (quoting *British Airways Bd. v. Port Auth. Of N.Y. & N.J.*, 558 F.2d 75,

83 (2d Cir. 1977)). As Congress explained in passing the Federal Aviation Act in 1958:

> [A]viation is unique among transportation industries in its relation to the
> federal government—it is the only one whose operations are conducted
> almost wholly within federal jurisdiction, and are subject to little or no
> regulation by States or local authorities. Thus, the federal government bears
> virtually complete responsibility for the promotion and supervision of this
> industry in the public interest.

*Big Stone Broad., Inc. v. Lindbloom*, 161 F.Supp.2d 1009, 1016 (D.S.D. 2001) (quoting

S.Rep. No. 85–1811, at 5 (1958)).

Under the Federal Aviation Act, the Secretary of Transportation is charged with "assigning and maintaining safety as the highest priority in air commerce." 49 U.S.C. § 40101(1). In response to this congressional mandate, the FAA has established a comprehensive regulatory scheme "addressing virtually all areas of air safety," including the certification of aircraft, most airports, pilots and mechanics; air traffic control systems; air navigation and communication; and airspace classifications. *Air Transp. Ass'n*, 520 F.3d at 224 ("Congress and the [FAA] have used this authority to enact rules addressing virtually all areas of air safety."); *see generally* 14 C.F.R. Parts 21–193; *see also Air Line Pilots Ass'n, Int'l v. Quesada*, 276 F.2d 892, 897 (2d Cir. 1960) ("[T]he legislative history of the Federal Aviation Act and the practice under prior law show that Congress intended the Administrator to have broad power to establish safety rules for the nation's airways...."). "This power extends to grounded planes and airport runways." 14 C.F.R. §§ 91.123 and 139.329.

Based on the foregoing, the Court concludes that Congress intended to occupy the field of airline safety. *Estate of Sesay*, 2011 WL 7501887, at *3 (quoting *Montalvo*, 508 F.3d at 473) ("federal law occupies the entire field of aviation safety."). "Congress' intent to displace state law is implicit in the pervasiveness of the federal regulations, the dominance of the federal interest in this area, and the legislative goal of establishing a single, uniform system of control over air safety." *Id*. (quoting *Montalvo*, 508 F.3d at 473). Further, and as particularly relevant in this case, the expansion of an airport runway and/or taxiways appears to also be an area preempted by the FAA. *See Township of*

*Tinicum v. City of Philadelphia*, 737 F.Supp.2d 367 (E.D.Pa. 2010) (airport expansion plan approved by FAA and city to construct or extend a runway and related developments to reduce congestion delays that included acquisition of land was part of airport safety a field which is preempted by federal law.). In *Burbank* the Ninth Circuit stated that, "[t]he proper placement of taxiways and runways is critical to the safety of takeoffs and landings," and thus regulation of taxiways and runways is preempted by federal law." *Burbank-Glendale-Pasadena v. City of Los Angeles,* 979 F.2d 1338, 1339 (9th Cir. 1992) (An ordinance requiring a local airport to submit for approval any plans that involved development-specifically runway and taxiway construction-on airport-owned land that interfered with the airport's plan to lengthen the runway for safety reasons was preempted because it directly interfered with aircraft operations.).

Although the Court has determined that Congress intended to occupy the entire field of air safety and regulation of the placement of runways and taxiways, that does not end the inquiry. The preemption determination is twofold. The Court must determine not only whether Congress intended to preempt but also the scope of that preemption. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992) ("The key question is thus at what point the state regulation sufficiently interferes with federal regulation that it should be deemed pre-empted[.]").

Courts have recognized that some areas of air safety are not preempted. *See Estate of Sesay*, 2011 WL 7501887, at *3 (holding the FAA has not pervasively regulated every aspect of airplane design such that it has preempted that area of aircraft safety or all state

law personal injury claims); *Goodspeed Airport*, 681 F.Supp.2d at 201 (State and local laws and regulations concerning protected wetlands and the removal of trees that obstruct air travel do not intrude upon the field of air safety so as to be preempted.); *Martin*, 555 F.3d at 808 (the Ninth Circuit has found that Congress did not intend "to exclude all state law personal injury suits from the area of air travel."). "Courts have long distinguished between state laws that directly affect aeronautical safety, on the one hand, and facially neutral laws of general application that have merely an incidental impact on aviation safety." *Goodspeed*, 681 F.Supp.2d at 202 (concluding that the scope or field of the federal preemption over aeronautical safety was not without limit and did not expand to preempt all state laws – including environmental laws that regulate activities for the purpose of protecting the environment that have nothing to do with aviation safety). In *Goodspeed*, the court noted that "laws regulating land use can co-exist with federal aviation law—at least in regards to principles of field preemption—so long as neither their purpose nor their effect encroaches into the field of airspace management or safety." *Id.* (citing cases). In deciding whether scope of the FAA's preemption applies in this case, the Court has looked at the particular allegations in the claims.

SilverWing has raised two state law claims: 1) Breach of the Covenant of Good Faith and Fair Dealing and 2) Promissory Estoppel. (Dkt. 77.) The breach claim alleges the TTF Agreement and Easement contain an implied covenant of good faith and fair dealing that the County breached by working toward extinguishing the perpetual nature of SilverWing's TTF Agreement and Easement as well as failing to perform its obligations

and satisfy its promises under those agreements. (Dkt. 77 at¶¶ 62-63.) The promissory

estoppel claim states:

> In 2007, the County provided to SilverWing an ALP that reflected the
> existing location of the Airport's runway, and made no mention or reference
> to any plans for the runway to be moved. At the same time, the County
> promised that there were no plans regarding changes to runway location
> which would be incompatible with SilverWing's Development.

(Dkt. 77 at ¶ 85.) SilverWing claims it reasonably and foreseeably relied upon the

County's promise that there were no plans to change the runway location to its economic

detriment. (Dkt. 77 at ¶ 86.) In this Motion, the County argues its actions challenged by

SilverWing on these claims were taken solely to enforce the FAA's regulations and,

therefore, SilverWing's contract claims are preempted. (Dkt. 80 at 9-12.)

Having undertaken a lengthy review of the record in this case, the Court finds

SilverWing's claim for breach of the covenant of good faith and fair dealing is preempted

by federal law but its claim of promissory estoppel is not. The difference between the two

claims lies in the allegations giving rise to each. Unlike the breach claim, the promissory

estoppel claim is based on allegations that do not involve interference with federal laws

and regulations sufficiently to fall within the scope of the preempted field.

The promissory estoppel claim centers around allegations involving the County's

representations to SilverWing upon which SilverWing relied in moving forward with the

proposed development and expending a great deal of money.[5] In particular, SilverWing's

---

[5] The Idaho Supreme Court has defined promissory estoppel as "'[a] promise which the
promisor should reasonably expect to induce action or forebearance on the part of a promisee or
a third person and which does induce such action or forebearance is binding if injustice can be

claims that the County failed to provide SilverWing with the current/correct ALP, the County repeatedly assured SilverWing that the alternative 2(B) layout would be used, the County allegedly requested that the West Taxiway be placed where SilverWing built it, and the County failed to get FAA approval for the TTF Agreement. Those representations occurred prior to the FAA's involvement and enforcement of its regulations. The fact that the FAA later determined the Airport was not in compliance does not mean the County may not be liable for any misrepresentations it made to SilverWing and/or its conduct in its dealings with SilverWing. As such, the Court denies the Motion for Summary Judgment as to the Promissory Estoppel claim.

This case is distinct from the case cited by the County where the city's participation in the settlement agreement was for the purpose of settling the lawsuit involving the city's obligation to bring its airport into FAA compliance. (Dkt. No. 80 at 10) (citing *City of Oceanside v. AELD, LLC.*, 740 F.Supp.2d 1183, 1188 (S.D. Cal. 2010)). Here, the County's actions giving rise to the Promissory Estoppel claim did not arise out of any federal regulatory obligation or efforts to come back into compliance with the FAA. The claim instead challenges the assurances and representations made by the County to SilverWing upon which SilverWing relied in going forward with its

---

avoided only by enforcement of the promise.'" *Profits Plus Capital Mngmt., LLC v. Podesta*, 332 P.3d 785, 803 (Idaho 2014) (quoting *Smith v. Boise Kenworth Sales, Inc.*, 625 P.2d 417, 421 (Idaho 1981) (quoting Restatement (Second) of Contracts § 901(1) (1973)).The elements required to support a claim for promissory estoppel are: (1) one party's reliance on a promise creates a substantial economic detriment, (2) the reliance was or should have been foreseeable, and (3) the reliance was reasonable and justified." *Id.* (citation omitted).

development. The Court finds the promissory estoppel claim is not preempted by federal law and the Motion for Summary Judgment is denied as to this claim.

As to the Breach of the Covenant of Good Faith and Fair Dealing claim, however, the Court finds this claim is preempted because it raises allegations that are based on the FAA's determination that the Airport was not in compliance with its regulations and the County's efforts to bring the Airport back into compliance.[6] In particular, the County's decisions and actions relating to the CAP and amended CAP were prompted by the FAA's December of 2008 decision placing the Airport in "non-compliance" status for three years or until the Airport achieved compliance with respect to: 1) entering into the TTF with SilverWing because its project included residential development and 2) the existence of mid-field runway access points throughout the Airport. (Dkt. 77 at 7.) Because the County's actions in regards to the allegations in the breach claim were made in order to bring the Airport back into compliance with the FAA, the Court finds this claim is preempted. The County and the Airport must comply with FAA regulations regarding air safety which includes runway-taxiway separation distance as well as the concerns regarding the TTF including regulations regarding mid-field access points and the incompatibility of residential developments near airports. The Motion for Summary

---

[6] "The covenant requires that 'the parties perform in good faith the obligations imposed by their agreement,' and a violation of the covenant occurs only when 'either party ... violates, nullifies or significantly impairs any benefit' of the contract." *Rizzo v. State Farm Ins. Co.*, 305 P.3d 519, 528 (Idaho 2013) (quoting *Idaho First Nat. Bank v. Bliss Valley Foods*, 824 P.2d 841, 863 (Idaho 1991)).

Judgment is granted as to the Breach of the Implied Covenant of Good Faith and Fair Dealing claim.

**4.      Section 1983 claims**

Section 1983 provides a cause of action for violations of a plaintiff's constitutional or other federal rights by persons acting under color of state law. *Nurre v. Whitehead*, 580 F.3d 1087, 1092 (9th Cir. 2009). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citation omitted). To prevail on the § 1983 claims, SilverWing must show that (1) acts by the County, (2) under color of state law, (3) deprived it of federal rights, privileges or immunities, and (4) causing it damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005) (quoting *Shoshone–Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)).

SilverWing raises two claims pursuant to § 1983: 1) Taking Without Compensation - Inverse Condemnation and 2) Violation of Equal Protection. (Dkt. 77.) The County argues the § 1983 claims should be dismissed as a matter of law because 1) it was acting under federal law, not state law, 2) there is no County custom or policy that was the moving force behind the alleged constitutional violation, and 3) the statute of limitations has expired. (Dkt. 80 at 12-18.) SilverWing counters each of these grounds and argues summary judgment on these claims should be denied. (Dkt. 85 at 10-16.)

A § 1983 cause of action may be maintained "against any person acting under the color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Southern Cal. Gas Co., v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) (citing 42 U.S.C. § 1983). Local governments and/or municipalities are "persons" who may be subject to suits under § 1983. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690 (1978). A municipality may, however, only be held liable for constitutional violations resulting from actions undertaken pursuant to an "official municipal policy." *Id.* at 691.

In *Monell v. Department of Social Services*, the Supreme Court held that "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." 436 U.S. 658, 691; *see also Jackson v. Barnes*, 749 F.3d 755, 762 (9th Cir. 2014). Instead, "[l]ocal governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the action is made "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Jackson*, 749 F.3d at 762-63 (quoting *Monell*, 436 U.S. at 690) (footnote omitted). "[I]t is when execution of a [local] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that

the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 693; *see also Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997) ("[W]e have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."). Thus, *Monell* liability may attach where a municipal employee acts pursuant to an expressly-adopted official policy or pursuant to a longstanding practice or custom that violates a person's constitutional rights under § 1983. *See Monell*, 436 U.S. at 691; *see also, Lytle v. Carl*, 382 F.3d 978, 981 (9th Cir. 2004); *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003).

In order to prevail on a § 1983 claim against a municipal government, a plaintiff must prove the following elements by a preponderance of the evidence: (1) action by an employee or official under color of law; (2) deprivation of a right guaranteed by the U.S. Constitution or a federal statute; and (3) action pursuant to an "official municipal policy." *Monell*, 436 U.S. at 690–692; *see also Taso v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012). Stated differently, in order to establish municipal liability, "the plaintiff must establish: (1) that he [or she] possessed a constitutional right of which he [or she] was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy was the moving force behind the constitutional violation." *Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th Cir. 2005) (citation and quotation marks omitted, modification in original); *see also Levine v. City of Alameda*, 525 F.3d 903, 907 (9th Cir. 2008) ("To establish

[municipal] liability, a plaintiff must establish that he was deprived of a constitutional right and that the city had a policy, practice, or custom which amounted to 'deliberate indifference' to the constitutional right and was the 'moving force' behind the constitutional violation.") (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996), cert. denied, 519 U.S. 1111 (1997)). Each of these elements must also be alleged with sufficient particularity; general or conclusory allegations will not suffice. *See, e.g., Estate of Brooks ex rel. Brooks v. United States*, 197 F.3d 1245, 1247 (9th Cir. 1999) (approving the dismissal of a *Monell* claim, on the grounds that "the complaint did not allege a deliberate County policy with sufficient particularity").

"There must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (en banc) (citation and quotation marks omitted). A municipality may only be liable if its policies are the "'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Monell*, 436 U.S. at 694); *see also Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) (A municipality can be sued under § 1983, but "it cannot be held liable unless a municipal policy or custom caused the constitutional injury.").

In this case, the County argues the § 1983 claims are barred because SilverWing has not suffered a deprivation of constitutional rights pursuant to any local policy or custom. (Dkt. 80 at 14-17.) The County asserts that its actions were motivated entirely to comply with FAA regulations and policies – not any local policy or custom. (Dkt. 80 at

16-17) (Dkt. 86 at 7-8.) SilverWing counters that "local government can be sued under § 1983 where the allegedly wrongful act 'implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.'" (Dkt. 85 at 11.) SilverWing goes on to argue the § 1983 claim is appropriate because this case involves state action properly authorized by the County. (Dkt. 85 at 12.) In reply, the County maintains the claim fails because there is no evidence that the "moving force" behind the municipal action that caused the deprivation was a local policy or custom that amounted to deliberate indifference of SilverWing's constitutional rights. (Dkt. 86 at 7.)

Municipal liability under Section 1983 can be established in three ways. First, the plaintiff may show that an employee committed a constitutional violation pursuant to an expressly-adopted official policy or to a "longstanding practice or custom which constitutes the 'standard operated procedure' of the local government entity." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). Second, the plaintiff may establish that the employee committing the constitutional violation was an official with "final policy-making authority" and "that the challenged action itself thus constituted an act of official government policy." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). Third, a plaintiff may prove that an official with policy-making authority "ratified a subordinate's unconstitutional decision or action and the basis for it" (*Gillette*, 979 F.2d at 1346–47) or that the official delegated that authority to the subordinate (*Ulrich*, 308 F.3d

at 985). The Court finds that the § 1983 claims brought by SilverWing in this case fail, as a matter of law, because there is no allegation that the County had a policy or custom that was the moving force behind the alleged constitutional violations or any action or ratification of an unconstitutional act by a policy-making official.

Both of the § 1983 claims raised here allege the County violated SilverWing's constitutional rights by denying SilverWing access to the Airport. (Dkt. 77 at ¶¶ 65-83.) Those claims do not, however, point to any County policy or custom that motivated the County's allegedly violating actions and/or that amounted to deliberate indifference. The claims allege the County acted through its Airport Advisory Board, the Airport Manager, and other County officials when it decided to expand the Airport. (Dkt. 85 at 10-16.) The actions complained of in SilverWing's § 1983 causes of action were, however, the County's efforts to bring the Airport back into compliance with FAA regulation – not unconstitutional acts of the County or ratifications of any unconstitutional acts by a policy-making official. There simply is no evidence of any County policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," that inflicted the injury that the County as an entity is responsible for under § 1983. *Monell* 436 U.S. at 693. As such, the Court grants the Motion for Summary Judgment as to the § 1983 claims.

## 5. Bifurcation

The County has also filed a Motion to Bifurcate the case seeking to separate the liability and damages phases of this matter. (Dkt. 81.) The County argues bifurcation will

promote judicial economy given the complexity of the issues involved on the liability question and because the liability and damages phases concern discrete, non-overlapping facts and issues. Finally, the County notes that bifurcation will eliminate prejudice against the County. SilverWing opposes bifurcation arguing the judicial economy would not be served by severing the trial phases and that prejudice would befall SilverWing, not the County, were the trial bifurcated. (Dkt. 83.)

In general, all claims and issues in a civil action are presented for resolution in one trial. Under Federal Rule of Civil Procedure 42, however, the court may bifurcate a trial for the 1) convenience of the court and the parties, 2) to avoid prejudice, or 3) to expedite and economize the trial process. Fed. R. Civ. P. 42(b). A district court is given "broad discretion" to determine whether bifurcation is appropriate. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Absent some experience demonstrating the worth of bifurcation, "'separation of issues for trial is not to be routinely ordered, ....'" Fed. R. Civ. P. 42(b) (advisory committee notes to the 1966 amendment).

The Court has reviewed the Motion and the arguments of counsel and denies the Motion to Bifurcate. A consolidated trial is more convenient to both the parties as well as the Court. The County has not demonstrated how it will be prejudiced absent bifurcation. The Court disagrees with the County's argument that the jury will be confused over the varying regulations and preemption issues. The Court has resolved the preemption question in this Order and is confident the jury will be able to grasp the issues involved in resolving the liability questions. Finally, separating the case into various phases does not

expedite or economize the trial process as there is likely some overlapping evidence between the two proposed phases. For the foregoing reasons, the Court denies the Motion to Bifurcate.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Defendants' Motion for Summary Judgment (Dkt. 80) is **GRANTED IN PART AND DENIED IN PART** as stated herein. The parties are directed to confer with one another and then submit a joint notice to the Court as to how they desire to proceed in this action whether it be by Alternative Dispute Resolution, Mediation, Judicially Supervised Settlement Discussions, or Trial. Such notice shall be filed on or before **December 15, 2014**.

2) Defendant's Motion to Bifurcate (Dkt. 81) is **DENIED**.

DATED: **November 21, 2014**

Honorable Edward J. Lodge
U. S. District Judge